## Case No. 11,186.

### PITMAN v. HOOPER.

[3 Sumn. 286; [1] 1 Law Rep. 226; 20 Am. Jur. 428.]

Circuit Court, D. Massachusetts. May Term, 1838.

SEAMEN'S WAGES—FREIGHT—TIME IN PORT—OUTWARD AND HOMEWARD VOYAGES — CAPTURE OF VESSEL ON RETURN VOYAGE—STALE CLAIMS.

1. Quære, in what cases the earning of freight is not necessary to give a title to wages.

2. Seamen are entitled to wages, for the full period of their employment in the ship's service for any particular voyage, in which freight is, or might be, earned by the owner.
  [Cited in Farrell v. Mayers, Case No. 4,685; The Erie. Id. 4,512; The General Chamberlain, Id. 5,310.]

3. One half of the time during which a vessel is lying in port is deemed to belong to the outward voyage, and the other half to the homeward voyage. This rule stands upon equity, convenience, and practice.

4. Where an American ship, in 1809, sailed from Marblehead, on a voyage to St. Petersburg and back, and performed her outward voyage, and on her return voyage was captured and carried into Denmark, and condemned by the Danish tribunals, and afterwards compensation was made under the treaty with Denmark, of the 28th of March, 1830, for the ship and cargo, held, that the seamen were entitled to full wages for the homeward voyage, as if it had been performed, including half the period of the ship's stay at St. Petersburg; or to full wages up to the time, when the seamen did return or might have returned home, without any unnecessary delay, deducting any wages, which they might have earned in the intermediate time in another employ. Three

months were treated as a reasonable time for the return of the seamen home.
  [Cited in The Niphon's Crew, Case No. 10,-277; The Ocean Spray, Id. 10,412.]

5. The wages for the outward voyage to St. Petersburg were, by the capture and condemnation, vested by an absolute title in the libellant, in 1809. They might then have been sued for, and, consequently, by lapse of time, upon the principles of courts of admiralty, are now stale claims, incapable of being asserted here.
  [Cited in Packard v. The Louisa, Case No. 10,652; The George Prescott, Id. 5,339.]

The parties in this case did not agree, as to the extent of the decree pronounced at a former term. See [Case No. 11,185]. The libellant [John Pitman] understood it to have been the intention of the court, to decree payment of the whole amount of wages from half the time the vessel remained in Russia, to the time of the arrival of the seamen in the United States. The counsel for the respondent [Robert Hooper] understood the court to say, that the receipt of the indemnity money did not revive any old claim, which the seaman might have prosecuted on his return home; that, whatever wages he might have recovered on his return, he could not now recover. This was as far as they understood the court to go, the particular circumstances of this case not being at any time before the court for consideration. Acting upon this principle, they supposed, if the libellant had, at the request of the master, remained by the ship from the time of the capture to the condemnation and sale, that for that time he was entitled to a compensation on his return home; and that, after the lapse of twenty years and a settlement with the owner being made on his return and proved, it would be presumed, that he had received it.

J. Pickering and J. Hardy Prince, for libellant.

C. P. & B. R. Curtis, for respondent.

STORY, Circuit Justice. This case has been again submitted to the court upon an incidental question, which has arisen in adjusting the claim of the libellant, upon the principles already decided by the court. The question is, whether the whole wages are to be calculated from half the time after the arrival of the brig at the port of St. Petersburg, in Russia; or, whether a deduction is to be made therefrom of the wages from the time of the capture up to the time of the first condemnation of the brig by the Danish tribunals.[2] The ground upon which this deduction is asked by the defendant is, that compensation for the wages from the capture to the condemnation might have been originally claimed by the libellant, for his services during that period, even if no restitution under the treaty ever had been made; and

---

[2] Compensation had been allowed to the owners for the capture and condemnation of the ship and cargo, under the treaty with Denmark, of the 28th of March, 1830. For a full report of the facts of the case, see [Case No. 11,185].

that, consequently, the amount ought now to be deemed, by the lapse of time, a stale demand.

Before I proceed to the consideration of the question as to this deduction, I wish to say something upon another point, which is involved in the adjustment, although it has not been made at the bar. It is, from what point of time the wages ought to be calculated; whether from half the time that the brig was at St. Petersburg, or from the time when the outward cargo was discharged at that port. I say that the point has not been made at the bar, and probably not made, because it has been deemed long since settled in the local jurisprudence of Massachusetts, as well as in the administration of maritime law in the courts of the United States exercising admiralty jurisdiction in this circuit. But my learned friend, Judge Hopkinson, of the district court of Pennsylvania, in his elaborate opinion in Bronde v. Haven [Case No. 1,924], has utterly denied the doctrine to be well founded, either in principle, or in authority. My great deference for the opinions of that able judge has induced me on this, the first occasion, which has occurred, to review the grounds of the doctrine; for if I now saw any error in it, so far as my own judgments are concerned, I should be well disposed at once to set about correcting it. But I am bound to declare, that, upon the fullest re-examination, I am entirely satisfied, that the doctrine is well founded in principle and in authority; that it is just and equitable, and is a natural, I had almost said a necessary, result of the enlarged policy of maritime jurisprudence, applicable to the wages of seamen. I do not propose to enter upon any elaborate exposition of the principles, on which the doctrine is established, but merely to advert to the more leading reasons for it, and the authorities, which support it. The general formulary, as laid down in Lord Tenterden's Treatise on Shipping. Abb. Shipp. pt. 4, c. 2, § 4, p. 447, is this: "The payment of wages is generally dependent upon the payment of freight. If the ship has earned its freight, the seamen, who have served on board the ship have in like manner earned their wages. And, as in general, if a ship, chartered on a voyage out and home, has delivered her outward bound cargo, but perishes in the homeward voyage, the freight for the outward voyage is due; so, in the same case, the seamen are entitled to receive their wages for the time employed in the outward voyage, and the unloading of the cargo, unless by the terms of the contract the outward and homeward voyages are consolidated into one." To language so very general, certainly nothing farther than general truth can be, or ought to be attributed. In truth, however, the language is far from being accurate; and it is not comprehensive enough to embrace the exceptions to the general rule, or even all the cases, which fall within it. Thus, it is not true in every case in the maritime law, that

the payment of wages is dependent upon the payment of freight; for if freight be earned, it is wholly immaterial, whether it be paid or not. So, the earning of freight is by no means necessary in all cases to give a title to wages; as, for example, where the ship performs her voyage without the owner having furnished any cargo, or where there is a special contract between the owner and freighter, varying the right to freight from the general law; as where the freight is made dependent upon the performance both of the outward and the homeward voyage. The case of shipwreck, where materials are saved from the wreck, furnishes a still stronger illustration; for in such a case the seamen earn their wages, as far as the materials saved go, even though the freight for the homeward voyage is wholly lost. The Neptune, 1 Hagg. Adm. 227. So that a moment's reflection will teach us, that the general text of Lord Tenterden does not contain a full or an accurate exposition of the whole doctrine applicable to the subject. It affords one out of many illustrations of the maxim, "In generalibus versatur error." If the doctrine be susceptible of any exact generalization (which perhaps it is not), it would be more correct to say, that the general rule, though not the universal rule, is, that the seamen are entitled to wages for the full period of their employment in the ship's service for any particular voyage, in which freight is or might be earned by the owner. Ordinarily, we divide voyages into the outward and the homeward voyage; though there certainly may be, and often are, many intermediate periods and voyages; as, for example, by vessels engaged in the freighting business. When seamen contract for a voyage from A to B, and thence back to A; the voyage from A to B is commonly called the outward voyage, and the voyage back from B to A the homeward voyage. And the maritime law in such a case, whether there be a cargo on board or not, treats these as distinct voyages, in which freight is, or may, upon its own principles, be earned. We are, therefore, accustomed to say that the seamen are entitled to their wages for the outward voyage, when ended, if freight is, or might have been earned on that voyage; and for the homeward voyage, if freight is, or might have been earned on that voyage. But the material inquiry still remains. When, in the sense of the maritime law, as to seamen's wages, does the voyage (either outward or homeward) commence and terminate? It certainly does not commence on the very day of the sailing of the ship on the voyage from the port of departure, and not before; or end with the very day of her arrival at her port of destination. Neither does it necessarily, as to the seamen, commence with the loading of the cargo on board of the ship; for the seamen may have been employed in the ship's service for a month before. Neither does it necessarily terminate with the discharge of the cargo, if

the seamen are still retained in the ship's service for a month longer, for purposes connected with that particular voyage. In some voyages, even now, it is not uncommon to land the cargo of the outward voyage, and to wait, until it is sold, before any homeward voyage is, or can be undertaken; and the homeward or ulterior voyage is in such cases mainly dependent upon the success of such sales; sometimes conducted by the masters and officers by what may be called a retail or barter trade. In the simplicity of the commerce in former ages, when the rule, we are considering, was first established, this was the common course of business. It is sometimes said, that the outward voyage is ended, when the cargo is landed, because freight is then earned; and that the homeward voyage commences, when the outward is thus finished. Neither of these propositions is, or can be admitted to be absolutely true; and both of them assume the very matter in controversy. It might with equal propriety of reasoning and logic be said, that the homeward voyage commences, when the cargo for the homeward voyage is taken on board; and of course, that the outward voyage then, and not till then, terminates. In some voyages the sale and discharge of the outward cargo, are going on simultaneously with the purchase and loading of the homeward cargo; as, for example, in the pepper and coffee voyages to some ports and islands in the Pacific Ocean. But although the freight is ordinarily earned by the discharge of the cargo, the discharge is not necessarily to be taken as the true test or termination of the voyage. Nor is it essential to it. If the cargo arrives at the port of destination, it may still be kept on board for a great length of time, to suit the purposes of the owner or shipper; and its discharge there may be made dependent upon future contingencies, as to the markets and prices; or a new destination may be given to it upon some new undertaking for another voyage in the same ship. In such a case it could not be correctly said, that the outward voyage continued after a reasonable time for the discharge of the cargo had passed. On the other hand, the cargo may be taken on shore for sale, and yet, from the want of a market, it may be required to be reshipped, and carried for sale to another port, in order to procure funds for the return cargo on the homeward voyage. Again; it is not true, that, because the outward voyage has terminated, therefore, eo instanti, the homeward voyage commences. Suppose a ship to carry a cargo to New Orleans, with instructions to the master to proceed on a freighting voyage, if, within a reasonable time after the discharge of the cargo, a freight could be procured for a foreign voyage, or, if freight could not be procured, to purchase a cargo on the owner's account, if it could be purchased at a reasonable price, and to proceed therewith to a foreign port; and, if neither could be obtained within the limits of the instruc-

tions, then to return home with a different cargo, or in ballast; could it be correctly said, in such a case, that the homeward voyage commenced immediately after the outward cargo was landed? That would be to say, that a new voyage was actually commenced, before it could be ascertained what that voyage would be. These cases show the danger of attempting to lay down any universal rule, as applicable to all cases, as to where the outward voyage ends, and the homeward voyage begins, in respect to seamen's wages. In a just and legal sense the outward voyage may well be deemed, generally, to continue as to seamen's wages, as long as the seamen are engaged in purposes connected with the outward voyage, whether the cargo is discharged or not; and the homeward voyage to begin, when any acts are done or preparations made, having reference exclusively to the homeward voyage. And, if there be any intermediate time, which is not properly referable to either, that may well be treated, like an intermediate voyage in ballast, to be for the benefit and purposes of the owner, and for which he ought therefore to pay the seamen for their services. In ordinary voyages it is not common to find any such intermediate time, or to measure it with exactness. And in many cases acts are done and proceedings had simultaneously with reference both to the outward and the homeward voyage; so that it is impracticable to divide the time with perfect accuracy, which is devoted to each. Now, I apprehend, that it was with a view to this practical difficulty, that the rule has been established, that one half of the time, during which the vessel is lying in the port, shall be deemed a part of the outward voyage, and the other half a part of the homeward voyage. In this, as in many other cases, the law prefers general certainty to mere metaphysical distinctions; and a compendious, practical result to the variable elements of every distinct voyage. The rule may seem at first view purely artificial; but it is in reality not so, but is founded upon what is ordinarily a reasonable apportionment of the time with reference to the exigencies of common voyages. It is like the allowance of the ten per cent. damages upon the protest of a foreign bill of exchange; and the deduction of one-third new for old in the common cases of repairs to ships; and the deduction in cases of general average of one-third from the amount of the gross freight of the ship in estimating its contributory value. The rule is founded upon the notion, that it is a nearer approximation to absolute equity between the parties, than any other which could be assigned; and thus it conduces to the general convenience of commerce, and subserves the great public policy of suppressing litigation upon trifling differences. Perhaps, if a rule were now for the first time to be established, upon grounds of mere equity between the parties, without any reference to maritime policy, it ought to be, to consider the seamen

absolutely entitled to their full wages in every event for the whole period, during which the ship lies in port, between the discharge of the outward cargo and the taking on board of the return cargo. Such a rule, however, would somewhat impair the policy of the general maritime doctrine, which connects and binds up the interests of the seamen with the interests of the voyage; and might seduce them into languor and indifference in the performance of their duties in port, and thus retard the operations of the voyage.

Nor is there any thing in the text of Lord Tenterden, which, properly considered, interferes with this doctrine. He admits, that "the seamen are entitled to receive their wages for the time employed in the outward voyage, and the unloading of the cargo." So that he admits, that the wages are due so long as the seamen are employed in the outward voyage; leaving the point when it ends to be decided upon the circumstances of each particular case; for I cannot admit that the latter words, "the unloading of the cargo," necessarily constitute a qualification of the former words, or were so intended to be understood by the author. If they were so intended, they are too loose to found any general doctrine upon them. His subsequent language, "if the ship sails to several places, wages are payable to the time of the delivery of the last cargo" (Abb. Shipp. pt. 4, § 2, c. 4, p. 447), was not designed so much to express the particular time, to which wages were due, generally, as to point out the distinction founded upon the deliveries of successive cargoes at different ports, and to state, that wages were due up to the last, and not merely to the first port of delivery. But, in truth, Lord Tenterden's text is not of itself of any intrinsic authority, beyond what the authorities, on which he relies to support it, justify. Now, it is remarkable, that, if his text imports, what it has been supposed to import, that the wages are due only up to the delivery of the cargo on the outward voyage, the authorities, on which he relies, do not support it; but they do in effect overturn it. It is for this reason, that I am not satisfied, that he did so construe the import of his own text. He relies on an anonymous case, reported in 1 Ld. Raym. 639, and in 12 Mod. 409. I will give the report at large in each book, as it is brief. In 1 Ld. Raym. 639 (Hil. T. 12 Wm. III.), it stands thus: "Upon a motion for a new trial in an action for seamen's wages, Holt, C. J., said, that if the ship be lost before the first port of delivery, then the seamen lose all their wages. But if she has been at the first port of delivery, then they lose only from the last port of delivery. But if they run away, although they have been at a port of delivery, yet they lose all their wages."[3] In 12 Mod.

409, under Trinity term (12 Wm. III.), it is as follows: "Holt, C. J., said: If a ship go freight of an outward voyage, the seamen shall have their whole wages out. But if, at their return, the ship be taken, or other mischief happen, whereby the voyage homeward is lost, they shall have but half wages for the time they were in the harbor abroad." Again; in an anonymous case (probably the same case) reported in the same volume (12 Mod. 442), under Hilary term (12 Wm. III.), it is stated thus: "Per Curiam. In respect to seamen's wages, the usage is, that, if the ship be lost before the arrival in the port of delivery, they lose their wages out. If she arrives safe in port, and is lost in her homeward voyage, they have their wages out, but lose their homeward wages. If they run away after arrival in port abroad, they lose their wages." In 1 Ld. Raym. 739, there is a report of an anonymous case,—most probably also the same case, when it was before Lord Holt, at nisi prius, for it was in the same year (12 Wm. III.[4]),—which is as follows: "If a ship be bound for the East Indies, and from thence to return to England, and the ship unloads at a port in the East Indies, and takes freight to return to England, and on her return she is taken by enemies, the mariners shall have their wages for the voyage to the East Indies, and for half the time that they stayed there to unload, and no more. Ruled by Holt, C. J., June 4, 1700, at Guildhall, at nisi prius." Now, whether (as I suppose the fact to be) these are all but different reports of the same case in its different stages at nisi prius, or in bank, or not, it is most manifest to me, that they mean to inculcate substantially the same doctrine, namely, that the wages for the homeward voyage only are lost by a loss of the ship on the return voyage; and that the homeward voyage is not calculated from the time of the discharge of the outward cargo. In the report (1 Ld. Raym. 639) the wages lost are said to be "only those from the last port of delivery." In the report in 12 Mod. 442, the wages lost are said to be "the homeward wages." In the report in 12 Mod. 409, it is said, that they (the seamen) shall have their "whole wages out;" but if the voyage homeward is lost, "they shall have but half wages for the time they were in harbor abroad;" which is the same as the whole wages for half the time. In the report in Ld. Raym. 739, it is said, that the seamen are to "have their wages for the voyage to the East Indies, and for half the time that they stayed there to unlade;" meaning, as I think, to

---

[3] The same point is stated, in almost the same language as used by Lord Holt, in anonymous case in Hil. T. 13 Wm. III., in 3 Salk. 23. There is a dictum of Lord Chief Justice Saunders, in 2 Show. 291, 34 & 35 Car. II., in what case, or on what occasion delivered, we do not know, as follows: "If a ship be lost before it comes to a delivering port, no freight nor wages is due. If lost afterwards, it is due to the last delivering port." See Cullen v. Mico, 1 Keb. 831.

[4] William III. and Mary began their reign on the 13th of February, 1688: so that Hilary term, 12 Wm. III., was in January, 1701.

"unlade and lade," the latter words being left out by mistake.[5] Taking all the reports together, not only do they not justify the doctrine supposed to be laid down in Abbott on Shipping, but they directly contradict it. In my judgment, there is no irreconcilable discrepancy in these different reports, properly understood. They intend to assert, that the wages of the homeward voyage only are lost in the cases supposed: and that these wages are the wages from the time of the departure from the last port of delivery, and for half the time, which the ship lay in that port.

The only other citation relied on in Abbott on Shipping, in support of the text, is the Ordinance of Rotterdam. art. 214, cited in 2 Magen, Ins. 113. That article is as follows: "Further, the full wages of the ship's company shall always be deemed to be earned, whether one or more complete voyages have been made in foreign ports, even though the ship should afterwards happen to be lost." There is no pretence to say, that this article in any manner supports the doctrine, that the seamen are not entitled to wages, except up to the time of landing the cargo.

I am, therefore, I repeat it, not satisfied, that it was Lord Tenterden's intention to lay down in his text the particular doctrine already commented on; for none of the authorities cited by him sustain it. All that he meant to state was, that the wages of the outward voyage would be payable, if freight was earned in that voyage; and the wages of the homeward voyage lost, if the ship perished on that voyage. And in this view it leaves the point perfectly open, when the outward voyage in any given case ends, and when the homeward voyage in any given case commences. Now the very rule which the cases in 1 Ld. Raym. and in 12 Mod. seem to promulgate, has been adopted in a great variety of cases in our American courts. I found it well established, when my own professional life began in Massachusetts; and it has been uniformly recognized and supported in that state. It is sufficient to refer to the cases of Hooper v. Perley, 11 Mass. 545; Locke v. Swan, 13 Mass. 76; Swift v. Clarke. 15 Mass. 173; and Moore v. Jones, 15 Mass. 424. The same rule was adopted by the supreme court of Pennsylvania in Galloway v. Morris, 3 Yeates, 445, and by the late venerable district judge of the district court of that state (and his large experience in maritime contracts entitles his judgments to very great weight) in the case of Giles v. The Cynthia

[5] In Mr. Justice Bayley's edition of Lord Raymond's Reports, the marginal note states the case, as I understand it, that the seamen were to be "paid for the outward voyage, and for half the time they stayed at the port of delivery." There is a dictum in Campion v. Nicholas. 1 Strange, 405. that seamen are not paid wages "while the ship is lading and unlading;" which, if understood according to the literal import of the words, is not reconcilable with the admitted principles of law.

[Case No. 5,424]; Bordman v. The Elizabeth [Id. 1,657]; Johnson v. Sims [Id. 7,413]; and in Cranmer v. Gernon [Id. 3,359]. My learned brother, the late Mr. Justice Washington, fully supported the same rule in his able judgment in Thompson v. Faussatt [Id. 13,954]; and it was substantially acted on by Mr. Justice Duvall in Jones v. Smith [Id. 7,497], the difference being more in terms than in judicial intention. Nor have I been able to trace a single intentional deviation from this rule, and the equities growing out of it, until Judge Hopkinson, in his elaborate opinion in Bronde v. Haven [Id. 1,924], shook its authority. The learned judge seems, in that opinion, to hold, that the outward voyage, with reference to seamen's wages, ends with the discharge of the outward cargo; and that the homeward voyage commences when the outward voyage ends. Now, assuming the first proposition to be true (which is admitted only for the sake of argument), the latter is not either a natural or a necessary consequence from it; for there may be (as we have seen) an intermediate period properly belonging to neither. The learned judge, however, admits no such intermediate period; but he deems all the time of the ship's stay in port, after the discharge of the outward cargo (however long it may be), to be positively and necessarily a part of the homeward voyage; and, therefore, if the ship is lost on the homeward voyage, wages are due to the seamen only up to the discharge of the outward voyage. In support of these propositions, he has produced no authority; or at least none, except the passage from Abbott on Shipping, already quoted, which does not sustain them, and is not (as we have seen) a just deduction from the authorities, on which his text is founded. The learned judge has suggested, that no authorities have been cited, which support the decisions the other way in the American courts. But he seems not sufficiently to have considered, that in the cases then in judgment, the American courts were not promulgating a new rule, but were merely recognising one already well known and well established. Thus, Judge Peters, in Giles v. The Cynthia [supra], speaks of the rule as the well "settled law in the court." So Mr. Justice Jackson, in delivering the opinion of the court in Hooper v. Perley, 11 Mass. 547, says: "The general rule, as to the wages of seamen, which has been for many years recognized and uniformly adopted in our courts, is, that if the ship has carried one or more freights, and is afterwards lost, before completing the voyage, for which the seaman is hired, he is entitled to his wages up to the last port of delivery, and for half the time that the ship lies in port." He neither cited nor commented on any authorities (the citations were merely those of the adverse counsel) in support of the doctrine, deeming it well known and standing upon principles long established in our local juris-

prudence.[6] But Mr. Justice Jackson has stated the general reasoning on which the rule is founded, with great clearness and strength, and his own extensive knowledge of commercial jurisprudence gives a weight to that reasoning, which it will be found difficult to resist. As yet, I have seen no attempt to meet, much less to overturn, that reasoning. And I entirely agree with that distinguished judge, that, "if we were at liberty, without reference to authority, to decide according to equity and good conscience, or to adopt a rule that would be most convenient in practice, we could not, perhaps, devise one better than that heretofore established." He puts his reasoning, in effect, upon this; either that the outward voyage ends with the discharge of the outward cargo, and the homeward voyage begins with the lading of the homeward cargo; and that then the intermediate period does not properly constitute a part of either voyage, and for that period full wages are payable; or that half of the period of the stay of the ship in port may be properly deemed referable to the concerns of the outward voyage, and the other half to those of the homeward voyage; and then the wages should be equally apportioned between them. The latter rule has been in practice adopted as the best rule; and it seems to me certainly founded in equity and general justice. My learned brother, Mr. Justice Washington, in Thompson v. Faussatt [supra], fully recognized the same doctrine, and upon the same ground. He said: "My own opinion upon this new and somewhat difficult case is, that whenever the vessel is lost on her return voyage, her arrival at the last port of delivery of the outward cargo, or at the last port of destination, if there be no cargo, fixes the time to which full wages are to be allowed, and that one half of her stay there should be added to the outward, and the other half to the homeward voyage, and to be considered respectively as parts thereof." Whether he applied his own rule correctly in that case, or not, need not be here considered. Now, it is incumbent upon those, who assert, that this is not a proper rule, to show, either that it is unjust and inconvenient in its practical operation, or that it is contradicted by some stringent and satisfactory authorities. As far as the authorities go, they are unequivocally the other way. And, for myself, I do not hesitate to say, that I should have felt myself bound by them, even if I had entertained some lurking doubts, whether they were founded in the most exact principles; for, in cases of this sort, it is far more important, that a rule should be established of general appli-

cation, though somewhat arbitrary, than to be left without one. Then, as to the injustice or inconvenience of the rule, promulgated by these authorities. where has it been shown or attempted to be shown? For myself, I can only say, that I am unable to perceive any rule, which is better founded in good sense, enlightened policy, or general equity. The opposite doctrine would, on the other hand, in many cases involve the harshest and most oppressive inflictions upon a class of men highly meritorious, and who are, by the very policy of the law, disabled from protecting themselves (as the owner may), by insurance, from the loss of their hard and stinted earnings. Take the case of a voyage to St. Petersburg, and back, where the ship arrives and delivers her cargo so late, that she must wait for a homeward cargo until the next season, a period of six or nine months; is it just or equitable. that the seamen should remain by the ship for such a period, and lose all their wages without remuneration? Take the case of a detention by an embargo for a like period after the outward cargo is landed, and before the homeward voyage is undertaken, or even definitely fixed upon, are the seamen to lose their whole wages, if the ship is lost in a homeward voyage afterwards planned and commenced? The whole error seems to me to consist in a gratuitous assumption, that the homeward voyage begins as soon as the outward cargo is landed. I am not aware, that there is any authority to that effect, either in our own or in foreign jurisprudence. In cases of insurance, the commencement and termination of the outward and the homeward voyage are governed by no such considerations; but depend upon the subject-matter of the insurance, and upon other collateral circumstances. See 3 Kent, Comm. (3d Ed.) lect. 48, pp. 307–316, and the cases cited in Seamens v. Loring [Case No. 12,583]: 1 Phil. Ins. (1st Ed.) c. 9, § 1, pp. 161–170.

No doctrine is to be found generally established in the maritime jurisprudence of continental Europe, independent of positive ordinances, that the seamen are to lose their wages of the homeward voyage and during their stay in port, if the ship is lost on that voyage. The text of the French Ordinance of 1681 (1 Valin, Comm. lib. 3, tit. 4, art. 8, p. 703), which is substantially the language of the present French Code of Commerce (article 288), contains a positive provision on the subject, which has been differently interpreted by her ablest commentators. Valin thinks (1 Valin, Comm. lib. 3, tit. 4, art. 8, pp. 703, 704. Pothier leaves the point of interpretation untouched. Poth. Mar. Cont., by Cushing, note 184, p. 111) that, if the ship is totally lost in the return voyage, the seamen are entitled to no wages whatsoever, even for the outward voyage. Emerigon, on the contrary, thinks, that, if freight is earned in the outward voyage, the seamen are entitled to their full wages up to the

---

[6] Judge Hopkinson has, by mistake, attributed this opinion to Mr. Chief Justice Parker. The citations of authorities, also, which he has supposed were relied on to sustain the judgment, were made, not by the court, but by the counsel adverse to the decision of the court.

time of the loss of the ship, upon the ground, that the wages attach as a lien upon the freight earned, "tota intoto, et tota in qualibet parte." Emerig. (2d Ed., 1834) tom. ii. pp. 239, 240, c. 17, §§ 2, 11, note. Delvincourt differs from both, and thinks, that the seamen in such a case are entitled to half their wages. Delvincourt, Inst. du Droit Com. (2d Ed.) tom. i. pp. 158–160; Id. tom. ii. pp. 258, 259, notes 1, 6. Boulay-Paty deems the seamen entitled in the same case to their full wages for the outward voyage and to none for the homeward voyage. Boulay-Paty, Droit Com. tom. ii. pp. 224, 225, tit. 5, § 8. See, also, Santayra sur Code de Com. p. 269, art. 258. But what I would particularly rely on, is the opinion of Pothier, who, in commenting upon this particular article of the Ordinance, admits, that it is an exception to the general principles of the contract of letting to hire, according to which, the seamen ought to be paid the part of the voyage elapsed up to the time of the misfortune, and not paid for the residue of the voyage. Poth. Mar. Cont. (by Cushing) p. 111, note 184; Id. p. 151, note 50. In general justice, then, this persuasive author shows us, that the exception has no foundation; and that it stands upon positive law as a matter of public policy. If it is to be extended beyond the homeward voyage, to embrace the stay of the ship in port from the time of the discharge of the outward cargo, it should be clear, beyond any doubt, that the public policy extends to it. That has not been shown, and, as I humbly conceive, cannot be shown. If resort be had to the doctrine of apportionment in courts of equity, where contracts have been by accident prevented from being carried into entire execution and performance, it will be found, that it favors the more liberal course. And it ought not to be forgotten, that, in contracts for seamen's wages, courts of admiralty always follow out the benign interpretations of equity, rather than the rigid principles of the common law.

Upon a careful review of the whole doctrine on this subject, which I had occasion to examine, and act upon, in the case of The Two Catherines [Case No. 14,288], on this point, I see no reason to change the opinion then expressed. I think that the question was at that time closed in by antecedent authorities, which ought to govern my own judgment upon such a question. But if there were no authority then or now existing on the subject, I should still approve of the rule as settled, as one founded in solid equity, in public policy, and in commercial convenience. It will reach the justice of most cases with as much certainty as is ordinarily attainable in human affairs. The true theory of the rule is, that the seamen ought to be paid wages for the outward voyage, and for all the time they are employed in port in the concerns thereof, and if freight is or might have been earned by the owner in that voyage, that the wages for the homeward voyage, and for all the antecedent period in port in which the seamen are employed in preparations or business connected therewith, are lost by a total loss of the ship and freight on the homeward voyage. That, for the sake of uniformity and certainty, half the time passed in port is attributed to each voyage, and is an apportionment commended by the double motive of suppressing litigation upon slight distinctions, and of accomplishing the ends of maritime policy, by which the right to wages is made in a good degree dependent upon the safety and success of the voyage.

The other question, which, indeed, is the only one propounded for the consideration of the court, does not seem to me to involve any intrinsic difficulty. The contract for mariners' wages, though in itself capable of division for some purposes, as, for example, in regard to the outward and the homeward voyage, is, for most purposes, treated as an entire contract. Although a seaman may, in many cases, be entitled to claim his wages for the outward voyage, upon the due performance thereof, yet, inasmuch as the claim arises under an entire contract for the round voyage, the mere fact of the earning of such wages on the outward voyage, does not amount to a positive severance of the contract, pro tanto. The most, that can be properly said, is, that it may give an election to the seaman to sue; and upon his election and suit, there will be an actual severance of the contract; but not before. For many purposes, indeed, the contract must be treated as an entire one, subsisting for the round voyage; for if, upon the homeward voyage, the seaman should grossly misconduct himself, that might involve the forfeiture of all his wages antecedently earned. That was the very case of The Mentor [Case No. 9,427]. It seems to me, therefore, that where wages are earned under an entire contract for the outward voyage, and yet the right thereto may be affected by subsequent events, and has not become absolute to all intents and purposes, the contract is not to be deemed ipso facto severed, but as subsisting as an entirety for the round voyage. Such at least is the opinion, to which my present reflections have led me, though certainly I do not wish to be bound by it, if upon further argument and reflection I should see reason to change it. In this view of the matter, in the events which did occur, the wages, which became due on the outward voyage to St. Petersburg, were, by the capture and condemnation, vested by an absolute title in the libellant, in 1809. They might then have been sued for, and consequently by lapse of time, upon the acknowledged principles of courts of admiralty, even if they have not been paid, they are to be treated as a stale claim, incapable of being asserted here. Indeed, in the present suit, which may be deemed in some sort, in the

nature of a proceeding in rem, against the proceeds of the captured property in the hands of the owner, under the award of the commissioners, there is no ground to say, that any indemnity has been received for such wages, or for the freight earned on the outward voyage; or that any trust, or equitable lien therefor, attaches to the fund. So far, then, as the claim for the wages of the outward voyage concerned, if they were in controversy. there is as little ground to say, that the claim is or could be revived by the award. In point of fact, I understand that it is not controverted that they were paid by the owner.

Very different considerations. however. do, in my judgment, arise in respect to the claim for the wages for the homeward voyage, including half the time of the stay at St. Petersburg. The capture of a neutral ship does not dissolve the contract for the seamen's wages. but merely suspends it; and it is not dissolved until the final condemnation. Up to that period, the seamen have a right to remain by the ship, and await the event, as an incident to their contract. So it was held by this court in the case of The Saratoga [Case No. 12,355]. If nothing more occurs, and the ship is condemned. the seamen lose their whole wages for the homeward voyage, unless, indeed, there is an ultimate decree of restitution. or an award of indemnity by treaty on account of the illegality of the capture, as in the present case; in which event the right to their wages revives as a trust, lien, or privilege attached thereto. The seamen cannot claim any compensation for their services between the time of the capture and condemnation, unless there is a new and distinct retainer, or contract of the master with them. to pay them a compensation for such services in every event. Such a contract is not to be presumed; but it must be distinctly propounded and proved. Now, in the present case, it is neither propounded in the answer. nor is it proved in the case; and as a matter of defence, the onus probandi is on the respondent. If such a contract had been proved, and payment under it had been also established, I should have thought that a deduction pro tanto ought to have been made from the present claim. If the contract had been made. but no payment under it had been made, I should have thought, that it could not have been propounded, as an extinguishment of the claim to wages pro tanto, since at most it would be but an accord without a satisfaction. Indeed, in an equitable view, it would be manifestly unjust, to allow the owner to deduct a sum under another contract, which he had never paid, in extinguishment of a legal claim under the shipping articles, and the award of the commissioners.

My judgment, therefore, is, that the libellant is entitled to full wages during the whole of the homeward voyage, in the same manner as if it had been performed, including half the time of the ship's stay at St. Petersburg, without any deduction; which is the substance, I believe, of the decree of the district court.

Afterwards, it was suggested by the counsel for the respondent, that, as the homeward voyage had not been performed, the time, up to which the wages were to be allowed, was uncertain; and that the district judge had allowed three months' wages from the time of the condemnation, as a reasonable time for the return of the seamen home, by analogy to the act of congress [2 Stat. 203], allowing three months' wages in cases of the discharge of seamen in foreign ports. There were other cases depending, in which the same point might arise, and, therefore, it was desirable to have it settled.

STORY, Circuit Justice. The rule in cases of this sort ought to be, to give wages up to the time, when the seamen did return, or might have returned home, without any voluntary and unnecessary delay on their part, deducting any wages they may in the intermediate time have earned in another employ. I should think, that, in the absence of all other proofs, the rule of the district judge was a very equitable one, as applicable to European voyages; although it might not be equally applicable to East India voyages. No objection being made to this allowance in the present case, it will of course stand. Decree affirmed.

